```
                    UNITED STATES BANKRUPTCY COURT
                   FOR THE SOUTHERN DISTRICT OF IOWA
                         COUNCIL BLUFFS DIVISION


IN RE:

DOUGLAS DEAN BATES                              Chapter 7

    Debtor.                              Bankruptcy No. 05-07616
_____

PELLETT PETROLEUM COMPANY, INC.
d/b/a Griswold Pelgrow

    Plaintiff

vs.                                      Adversary No. 05-30258-wle

DOUGLAS DEAN BATES

    Defendant.
```

## DECISION

Pellett Petroleum Company, Inc., d/b/a Griswold Pelgrow (hereinafter "Pelgrow") seeks to have its claim against Douglas Dean Bates excepted from Bates's discharge. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Trial was held November 29, 2006 in Council Bluffs. James L. Pray appeared as attorney for Pelgrow. Howard T. Duncan appeared as attorney for Bates.

Pelgrow alleges (1) that Bates fraudulently obtained an extension of credit from it during the 2003 crop year, and (2) that Bates willfully and maliciously converted its crop collateral. Bates denies these allegations.

Bates resides in Lewis, Iowa. After graduating from Griswold High School in 1982, he began farming, first with his father, Dean Bates, and later on his own. During the years relevant to this proceeding, Bates's farming operation involved

raising crops and livestock.  Beginning no later than 2001, he borrowed operating money from Midstates Bank, N.A. in Avoca, Iowa (hereinafter "Midstates" or "Bank").  To secure his indebtedness to Midstates, he granted it a security interest in crops, livestock, and farm equipment.

Bates began having financial difficulties during 2001. During the winter, he had death loss of more than 200 head of cattle.  Also, he lost money hedging cattle.  From January 2001 to August 2002, his net worth decreased significantly.  Midstates lent operating money to Bates in 2002, but beginning early that year, Midstates no longer permitted Bates to use loan proceeds or collateral proceeds to pay for living expenses.

Also during 2002, Bates began to have marital problems.  His spouse, Christy, moved out of the home in November.  After briefly returning home, she left permanently in December. Christy was jointly indebted to Midstates, and Bates feared that divorce proceedings would adversely affect his business relationship with the Bank.

Bates and his father, Dean, were both long-term customers of Pelgrow, having purchased product there for approximately 10 years.  Bates and Dean would make separate purchases, but it was also commonplace for one or the other to purchase product in bulk and divide it between them.  They would inform Pelgrow of the sharing so that Pelgrow could bill them separately according to the division.

It was Bates's regular practice to apply anhydrous ammonia and fertilizer to his fields in the fall.  He would pay Pelgrow

2

for the product and any application charges before December 30. Bates would buy his crop inputs for the following spring and also pre-pay those expenses.  Through the end of 2002, Bates had had a good credit history with Pelgrow.  As of the beginning of November 2002, Bates owed nothing on his account with Pelgrow. During that month, he purchased anhydrous ammonia and fertilizer; two of the purchases were split between him and Dean.  Assuming Bates was being charged on his invoices only for his share of the joint purchases, his account debt to Pelgrow by the end of November 2002 totaled $14,282.82.

    On December 10, 2002, Bates met with Brent Hansen, the president of Midstates's Avoca branch.  Hansen recorded in a Comment Sheet in Bates's loan file that he told Bates that the Bank would have problems obtaining a Farm Service Agency guaranty on Bates's line of credit, and that Bates should look at refinancing at another bank or he should consider liquidation (exhibit 78, p. 3).  Bates understood, prior to January 1, 2003, that Midstates would not lend money to him in 2002 for 2003 expenses, at least until he reduced his debt to Bank.

    Because, at the time, he was without financing for the 2003 crop year, Bates was unable to pay for the fall fertilizer or to pre-pay for spring supplies.  Sometime in December, Bates visited James Rogers, the manager for Pelgrow at Griswold, Iowa.  Bates disclosed that divorce was a prospect, and that he did not know if the Bank would lend him the money to pay for inputs by December 31.  Rogers suggested that Bates make a production credit loan application with Pelgrow.  Bates provided the

3

information for the application, Rogers filled it out, and Bates signed it on or about December 5, 2002 (exhibit 26). Bates did not receive approval for the financing. He believed it was because Christy would not sign the application.

After the denial of credit by Pelgrow, Rogers said they went into a "holding pattern" to see what Bates could do about financing for 2003. Rogers testified that during that time Pelgrow would not sell product to Bates on open account. However, Dean did order product from Pelgrow on credit, and at least two such purchases were later "split" with Douglas (exhibit 28, pp. 11-12).

Rogers testified that at some point, Bates came in and told him that he had worked it out with Midstates that if he sold his farm and paid the proceeds to the Bank, the Bank would finance his crop for 2003. It was assumed or discussed that Pelgrow would be paid from the Bank's advances. Rogers said he had no reason to disbelieve Bates, and at that point he again allowed Bates to purchase product on credit. He said he would not have financed future sales if he did not think Midstates was going to finance Bates. Rogers was not certain when the conversation with Bates took place, but he believed it to be prior to April 1, 2003. Bates does not disagree with Rogers's account of their conversation. He believed that Midstates had agreed to finance the crop if he gave them the proceeds from sale of the land.

After the conversation between Rogers and Bates, Bates began purchasing supplies from Pelgrow on account. From April 30 through July 4, 2003, there were 17 invoices for purchases, 10 in

4

Bates's name alone, and seven on product shared with Dean. Bates's debt on the 17 invoices was $28,895.97. By July 5, 2003, Bates's account balance, including finance charges, was $49,528.29 (exhibit 28, p. 17).

Bates owned 75-80 acres of land that had belonged to his grandfather. By mid-November 2002, Bates had received an offer to purchase the land. He was working with a realtor on the potential sale (exhibit 78, pp. 2-3). By March 17, 2003, Bates had accepted an offer on the land (id., p. 3). It was anticipated that Bates would receive a net payment from the sale of approximately $120,000.00. It took nearly four months to complete the sale. Closing was scheduled for July 9, 2003. Although Bank had no mortgage against the farm, Hansen called the realtor and asked that Midstates be named as a payee on the closing check to Doug and Christy Bates. Midstates was named as a payee on the check which was in the amount of $128,000.00. Christy endorsed the check, and Bates took it to Midstates on July 9. The Bank's Comment Sheet states that Midstates applied $106,500.00 to Bates's loans, and the Bank "released" the balance for attorney fees and 2002 cash rent (exhibit 78, p. 3).

Hansen's commentary states also that on the day the check was delivered, a liquidating plan was begun. Bates was to liquidate 2002 and 2003 crops, livestock, and machinery. The notes state that the Bank and Bates "[w]ill set up final liquidation agreement after receipt of appraisal." (Id., p. 4). Hansen's comments also state that he told Bates that the Bank "would be out" so far as his future farming was concerned (id.).

5

Bates testified that he was upset that after turning over the land sale proceeds, Bank was not agreeing to provide him with financing. Now, he said, Midstates wanted an appraisal of his equipment. Bates testified that about the time of the closing, he "saw the writing on the wall" that Bank would not lend to him. Nonetheless, he arranged for an appraisal. Bates recalls that it was the end of July or the first part of August that Hansen notified him by phone that Midstates would not provide him with financing.

Bates stopped in at Pelgrow to pick up supplies, and Rogers approached him about the financing. Rogers says that at that meeting, Bates told him he had sold the farm, but still he had no financing from Bank. Rogers recalls the meeting took place the first part of July. I find it more likely that it took place after July 9, and by no later than July 14.

Rogers asked Bates to sign a Certified Request and Waiver of Confidentiality so that Pelgrow could obtain an agricultural supply dealer lien under Iowa Code Chapter 570A. The document was filled out to cover product and services purchased by Bates from "November 1, 2003 through August 30, 2003." The form was no doubt meant to include purchases beginning November 1, 2002, not 2003. Rogers and Bates signed the document on July 14, 2003 (exhibit 1). The request was mailed to Midstates on July 18.

Upon receipt of a certified request, a financial institution which has a security interest in collateral owned by the farmer or which has outstanding agricultural loans to the farmer, is to issue, within four business days, a memorandum stating whether or

6

not the farmer has sufficient net worth or line of credit to assure payment of the purchase price on the terms of sale from the supply dealer (Iowa Code § 570A.2(1)). The certified request is to be received by the lender "prior to or upon a sale on a credit basis" (id.) That was not the case here. If the financial institution's memorandum does not state that the farmer has sufficient net worth or a line of credit to assure payment to the ag supply dealer, the institution is to transmit the relevant financial history which it holds on the farmer (id.). That also was not done.

Hansen, on behalf of Midstates, sent Pelgrow a response dated August 5, 2003 (exhibit 2). It stated:

> This letter is to inform you that Midstates Bank, N.A. has not arranged a line of credit for 2003 crop year for Doug Bates. I would ask that you obtain a Financial Statement from Doug to determine if he has sufficient Net Worth to assure payment of the purchase price of the products that you mentioned in your request.
>
> Please feel free to contact me if you have any questions at (712) 343-6341.

Exhibit 2.

Absent the statutory letter of credit from Midstates, Rogers opted to secure Pelgrow's claim against Bates under Iowa Code § 570A.3. Pelgrow filed a financing statement to perfect the lien on August 25, 2003 (Exhibit 3). See Iowa Code § 570A.4.

After Bates executed the Certified Request and Waiver, he made six more purchases of product from Pelgrow (exhibits 4-9). These totaled $5,515.70. The purchases were made from July 25 through August 31, 2003 (id.). He made no purchases from Pelgrow

7

after August 31.

The total of all purchases from Pelgrow by Bates for the 2003 crop, not including finance charges, was $51,758.18. Between July 30, 2003 and March 22, 2004, Pelgrow received four payments on the account totaling $18,422.48. As of December 30, 2004, Bates's debt to Pelgrow, including finance charges, was $46,037.16 (exhibit 28, p. 60).

By December 1, 2003, Midstates had served Bates with notice of acceleration on his notes and demand for payment in full of all debt (exhibit 32). Midstates had been sending Bates notices of right to cure defaults throughout most of 2003 (exhibits 59-76). Bates did not discuss these with Rogers. Bates knew he was in serious financial trouble, but he was doing what he could to reduce the debt to the Bank, and he testified that Hansen told him the notices were necessary for bank examiners.

Bates farmed five parcels of ground in 2003. The largest was a 429-acre parcel rented for cash from Frank Bauer. He farmed the 75 acres which he sold in July, and he was entitled to the crop in the year of sale. He also farmed a 120-acre parcel owned by the Bates Trust. It contained 105 tillable acres. Bates farmed it on a 50/50 crop share basis with Dean. Bates and his father also farmed on a 50/50 basis a 200-acre parcel rented from the Dwight Parker Trust. The fifth farm was leased from Byron Tye for cash rent. It contained 104.5 acres.

From the farmground, Bates was entitled to approximately 760 acres of crops. Bates grew corn on the 75 acres. He fed the harvested corn to his cattle. On the Bauer farm, Bates planted

8

200 acres of corn and 229 acres of beans. The bean crop was sold to pay Bauer the 2003 rent, which was approximately $61,000.00.

Bates harvested about 30,000 bushels of corn from the Bauer farm. He valued the corn at $2.30 to $2.50 per bushel. He stored approximately 14,000 to 16,000 bushels of the corn in two bins and a Harvestore on the Bauer farm. The remaining bushels he sold.

From the remaining three farms, Bates estimates he harvested 128.5 acres of corn and 128.5 acres of beans. He estimated the corn harvest at 130 bushels per acre at a value of $2.30 per bushel. He estimated the bean harvest at 40 bushels per acre at a value of $5.35 per bushel. The total value of crops from the Tye farm, the Bates Trust farm and the Parker Trust farm was about $65,921.00.

Bates intended to sell the corn stored in the bins on the Bauer farm and to use the proceeds to pay his debt to Pelgrow. In December 2003, Bates contacted Rogers and told him about the stored grain and that he would sell it and pay Pelgrow in 2004.

By December 1, 2003, Midstates began collection efforts against Bates. By late December, Midstates had filed a replevin action against Bates to recover collateral. Bates's attorney, Michael J. Winter, scheduled a meeting with Midstates and its attorney, Richard Schenck. Winter and Bates met with the attorney and Bank representatives on January 8, 2004.

At the meeting, Midstates asserted that it had a security interest in the 2003 crop and other assets. Bates did not think that Midstates had a security interest in the 2003 crop because

9

Midstates provided no financing to grow the crops. Moreover, Bates wanted to use the proceeds of remaining 2003 crops to pay farm expenses including the Pelgrow debt. The value of the corn in storage on the Bauer farm was estimated to be from $32,000.00 to $40,000.00. At the meeting, Winter advised Bates that Midstates did have a security interest in his 2003 crop despite not having financed it. By the close of the meeting, Bates, on the advice of his attorney, had agreed to surrender the corn in the three bins to Midstates, and he did so. He also agreed to surrender 8,500 bushels of crops grown on a shared basis with Dean (exhibit 31, p. 3).

It is difficult to determine precisely from the testimony and exhibits what happened to the remaining 2003 crops. Clearly Bates sold quite a bit of it. From October 1, 2003 through November 6, 2003, Bates received 11 checks from United Farmers Mercantile Cooperative in Red Oak for the sale of crop. These checks totaled $110,059.98 (exhibit 79, pp. 11). One of the checks was for $17,348.36. Bates deposited it into his account at Midstates and attempted to pay rent obligations and insurance costs. Midstates offset the money and applied it to Bates's debt.

Bates used other crop sales proceeds to pay farm expenses. These included crop insurance, his farm blanket insurance policy, fuel costs, repair costs, cash rent, and other general operating expenses. No evidence was introduced as to how much money was spent from the crop proceeds on these expenses. Midstates verified payment of cash rent to three landlords totaling

10

$44,500.00 and repayment of a $35,000.00 input loan from landlord Frank Bauer (exhibit 78, p. 5, entry 12/9/03). Pelgrow received only $14,128.04 after the harvest had begun.

Pelgrow filed a civil action against Bates and Midstates in Iowa District Court for Cass County on November 5, 2004 (exhibit A). On various theories, it sought to recover all or part of Bates's 2003 crops or proceeds thereof from Midstates. Also it sought to recover from Bates for the balance due on the account and for fraud. Bates filed his chapter 7 petition on September 28, 2005. Pelgrow ceased to pursue Bates in the state court action. It dismissed its petition against Midstates.

## Intentional Misrepresentation

Pelgrow asks that its claim against Bates be excepted from Bates's discharge under 11 U.S.C. § 523(a)(2)(A) which excepts from a debtor's discharge any debt for property or services or an extension of credit obtained by fraud. Pelgrow contends that Bates knowingly and intentionally misrepresented to it that Midstates had told him that it would finance the inputs on Bates's 2003 crop after Bates had sold his farm and paid the proceeds of sale to Midstates.

To recover on this theory, Pelgrow must prove by a preponderance of the evidence that:

>     (1) Bates made a representation of a material fact;
>     (2) at the time, Bates knew the representation was false;
>     (3) Bates made the representation deliberately and
>     intentionally with the intent to deceive Pelgrow;
>     (4) Pelgrow justifiably relied on the representation;
>     (5) Pelgrow sustained damage as a proximate result of
>     Bates's representation.

Merchants National Bank v. Moen (In re Moen), 238 B.R. 785, 790 (8th Cir. B.A.P. 1999).

Bates made the representation alleged by Pelgrow. It was material to Pelgrow's decision to sell on credit to Bates. Pelgrow justifiably relied on the representation and sold nearly $29,000.00 in product to Bates on credit after the statement was made and before it learned otherwise. As a result, it was damaged by an unpaid amount on some of the sales to Bates.

There is no dispute as to what Bates told Rogers at Pelgrow. Bank president Hansen denies that any promises were made in exchange for the land sale proceeds. Bank's loan file Comment Sheet supports Hansen's denial. Bates's representation to Pelgrow of Midstates's stated intention was a continuing one from about April 1, 2003 until July 14, 2003. There is no evidence that during this period Midstates ever provided Bates with copies of Bank's Comment Sheet. Based on Hansen's testimony and the Comment Sheet, I find that Midstates did not intend to loan money to Bates to finance inputs for the 2003 crop, regardless of whether Bates paid it the proceeds of the land sale.

What was Bates's perception of his relationship with Bank? Bates knew he was in financial difficulty and that his relationship with Bank had changed for the worse. He had defaulted on loan repayments, and by mid-January 2003, he was beginning to receive notices from Bank on his right to cure. He knew also, by January, that Bank was holding off lending him money for 2003 and that it wanted reduction of his debt by liquidation of assets if necessary.

If a banker at Midstates did not make anything like the alleged statement, then Bates's representation to Pelgrow was false, and Bates would have known it was false. But that does not mean that someone at Bank did not make a statement to Bates that Bates reasonably construed as a promise to lend on certain conditions. It is difficult to determine precisely what was said between the bankers and Bates.

It is possible that something a banker told Bates led him to engage in wishful thinking about the Bank's intent to lend him money. Perhaps he misunderstood a statement by a banker. Perhaps a banker said something in the context of financial discussions that led Bates to believe that Bank would lend for 2003. Or, it might be that the possibility of 2003 input financing was used by a banker to encourage Bates to turn over the proceeds of a sale of land against which Midstates held no lien. Bates may be recounting events accurately from his viewpoint; so might the Bank. The truth of what was said is difficult to determine from the conflicting accounts of the witnesses. This is sometimes called the "Rashomon effect" after the famous movie by director Akira Kurosawa. The film depicts a violent crime from the very different and contradictory accounts of four witnesses. It leaves the viewer unable to decide the true facts.

I believe the real issue here is whether Bates believed to be true what he told Rogers about Bank's intentions. I find that Bates did believe that Midstates had agreed to lend him money on 2003 crop inputs on the condition that he pay the Bank the

13

proceeds from his land sale. And the payment of those proceeds to Bank is the strongest evidence that Bates believed what he told Pelgrow. He paid Midstates $128,000.00 from the sale of the land. Bank had no right to the proceeds by virtue of any lien. It is likely that Bates paid Bank because he believed that if he did, Bank would keep a promise to help him financially through the 2003 season.

Bates testified that he did not believe Midstates had a lien on his 2003 crop. I do not find that belief unreasonable for a young farmer with a high school education. He could reasonably have no knowledge of any after-acquired-property effects of a security agreement. If he believed Bank had no lien on his growing crop, and he also believed that Bank was irrevocably finished lending him money, it would have been more to his benefit to finance his crop from the land sale proceeds, not to turn them over to the Bank.

Also, the timing of the representation to Pelgrow supports Bates's belief in the truth of such a representation. He told Midstates about March 17 that he had accepted an offer on the land. He made the alleged representation to Pelgrow about April 1. Bates testified that he realized when he paid Bank on July 9 that they were not going to lend to him. By July 14 he had told Rogers that Midstates would lend no money, despite payment of the land proceeds. His belief in his representations to Pelgrow corresponds with these other events.

Pelgrow has failed to prove by a preponderance of the evidence that a Midstates banker did not make the statement to

14

Bates.  But more importantly, Pelgrow has failed to prove by preponderance of the evidence that Bates knew that his representation to Pelgrow as to Midstates's statement of intention to him was false or that he intended to deceive Pelgrow.  Pelgrow's claim against Bates under 11 U.S.C. § 523(a)(2)(A) will be dismissed.

## Conversion

Pelgrow alleges also that Bates converted its collateral.  It asks that its claim for conversion be excepted from discharge as a willful and malicious injury to Pelgrow's property interests pursuant to 11 U.S.C. § 523(a)(6).  Determination of this claim depends on whether Bates's conduct was "(1) headstrong and knowing ('willful') and, (2) targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm."  <u>Barclays American/Business Credit, Inc. v. Long (In re Long)</u>, 774 F.2d 875, 881 (8th Cir. 1985).

There is no question that the value of Bates's 2003 crops was substantial.  I estimate it to have been approximately $196,000.00 as harvested, without deduction for harvesting, hauling or costs of sales.  This does not include the 75 acres of corn which Bates fed to his cattle.  Beans were valued at about $88,756.00 and of that amount, approximately $62,000.00 was paid to Frank Bauer for 2003 rent.

This left about $27,500.00 in beans and $107,421.00 in corn.  The corn value corresponds roughly to the total of the sales

15

checks paid to Bates by United Farmers Mercantile at Red Oak. Eleven checks total $110,059.98. Seventeen thousand dollars worth of crop monies deposited at Midstates was offset by Bank. Bates admits he paid farm bills with some of the proceeds. These included bills for crop insurance, farm blanket insurance, an input loan from Bauer, fuel, repairs and cash rents. There is no exact figure on the total of these payments. He also may have paid some personal expenses. He paid some creditors who had no liens on his crops, and he does not dispute that Pelgrow had a lien. But at the time he paid these other bills, he appeared to have sufficient crops remaining to pay Pelgrow in full, and he intended to do so. I find that any conversion of Pelgrow's collateral to pay farm expenses was not malicious.

At the beginning of January 2004, Bates had about 24,500 bushels of corn stored at various locations. He told Pelgrow he was going to sell the corn and pay his debt to Pelgrow, and the value of that corn was sufficient to pay Pelgrow in full. However, on January 8, when he and his lawyer met with representatives of Midstates, Bates was advised by his lawyer that Midstates had a prior claim to all the remaining 2003 crops. Bates agreed to surrender the remaining crop, and he or his father, on his behalf, did so. Even after the agreement, Pelgrow received some payments from the sale of 2003 corn. These payments amounted to about $14,000.00. I find that Bates's surrender of 2003 crops to Midstates was not a willful and malicious conversion of Pelgrow's collateral. Pelgrow's claim under 11 U.S.C. § 523(a)(6) will be dismissed.

<u>ORDER</u>

IT IS ORDERED that judgment shall enter that the complaint of Pellet Petroleum Company, Inc. against Douglas Dean Bates seeking exception of its claim from Bates's discharge is dismissed.

DATED AND ENTERED   February 6, 2007

William L. Edmonds, Bankruptcy Judge